UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MICHELLE K. WATSON,

Plaintiff,

v.

THE RICHMOND UNIVERSITY MEDICAL
CENTER; THE STATE UNIVERSITY OF NEW
YORK DOWNSTATE MEDICAL CENTER; THE
STATE OF NEW YORK, EDWARD ARSURA, M.D.,
in his individual capacity and as Senior Vice President
and Chief Medical Officer of the Richmond University
Medical Center; MAJA NOWAKOWSKI, PH.D., in her
individual capacity and as Associate Professor of
Pathology and Medicine of the State University of New
York Downstate Medical Center, and as Director of Pre and
Post Doctoral Education, Center for Allergy
Research at the State University of New York Downstate
Medical Center,

Defendants.

**MEMORANDUM ORDER**
14-CV-1033 (LDH) (AKT)

LᴀSHANN DᴇARCY HALL, United States District Judge:

Plaintiff Michelle K. Watson brings the instant action against Defendants The Richmond

University Medical Center ("RUMC"); Edward Arsura, M.D. (collectively, "RUMC

Defendants"); and Maja Nowakowski, Ph.D., arising out of Plaintiff's participation in two

fellowship programs operated under the Empire Clinical Research Investigator Program

("ECRIP"). (*See generally* 1st Am. Compl. Declaratory Relief, Injunctive Relief, & Damages

("Am. Compl."), ECF No. 36.)[1] Plaintiff alleges the following: (1) disparate treatment, hostile

work environment, and retaliation in violation of Title VII against RUMC; (2) a 42 U.S.C.

---

[1] By stipulation dated January 11, 2016, Plaintiff withdrew her claims against the State of New York and several of
her claims against the State University of New York Downstate Medical Center ("SUNY Downstate") and the
individual Defendants in their official capacities. (ECF No. 55.) Plaintiff's remaining claims against SUNY
Downstate were dismissed by order dated March 9, 2017. (ECF No. 68.)

§ 1983 claim against Dr. Nowakowski in her individual capacity for violations of the Equal

Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (3) violations of the

Fair Labor Standards Act, 29 U.S.C. §§ 201-219, against RUMC; and (4) breach of contract

against all Defendants.  Defendants move pursuant to Federal Rule of Civil Procedure 56 for

summary judgment dismissing the complaint in its entirety.  (ECF Nos. 107 (RUMC Defs.), 110

(Nowakowski).)

## BACKGROUND[2]

### I.      The First ECRIP Grant

ECRIP is a fellowship program that trains physicians in clinical research.  (Pl.'s Local

Civ. R. 56.1 Counterstatement Disputed Material Facts & Local Civ. R. 56.1(b) Statement

Additional Material Facts Opp'n Def. Nowakowski's Mot. Summ. J. ("Nowakowski 56.1") ¶ 7,

ECF No. 117-49.)  Plaintiff, a 44-year-old African-American doctor, was hired to work as a

research fellow from July 1, 2009, to June 30, 2010, for the second and final year of an ECRIP

project at SUNY Downstate.  (*See id.* ¶¶ 1, 14, 20-21; Def. Maja Nowakowski's Corrected Resp.

Pl.'s Local Civ. R. 56.1 Counterstatement Material Facts ("Nowakowski Reply 56.1") ¶ 73, ECF

No. 115.)  Plaintiff was supervised by Dr. Nowakowski (the "First ECRIP Grant").   (*See*

Nowakowski 56.1 ¶¶ 20-21.)  The fellowship was sponsored by Coney Island Hospital ("CIH"),

and CIH was responsible for paying Plaintiff's salary.  (*Id.* ¶¶ 23-24.)  Due to the New York

State legislature's failure to pass a budget, funds were not available for CIH to pay Plaintiff for

an unspecified period of time.  (*Id.* ¶ 25.)  To assist Plaintiff with expenses during this period,

Dr. Nowakowski lent Plaintiff $2,400 in July 2009, which Plaintiff has never repaid.  (*Id.* ¶¶ 26-

---

[2] The following facts are taken from the parties' statements of material facts pursuant to Local Civil Rule 56.1.  The are undisputed unless otherwise noted.

27.) CIH ultimately paid Plaintiff in full, including back pay. (*Id.* ¶ 28.) Around this time, because Plaintiff was not receiving salary payments or health care coverage, Plaintiff claims that Dr. Nowakowski stated to Plaintiff: "If you're so concerned about not having health coverage, why don't you go across the street to the county hospital and get yourself some Medicare-Medicaid." (Pl.'s 56.1 Local Civ. R. 56.1 Counterstatement Disputed Material Facts & Local Civ. R. 56.1(b) Statement Additional Material Facts Opp'n [RUMC Defs.'] Mot. Summ. J. ("RUMC Defs.' 56.1") ¶ 28, ECF No. 108-51.)

Plaintiff was informed by an administrative assistant that she was the first African-American fellow hired to work in the pathology department. (Nowakowski 56.1 ¶ 30; RUMC Defs.' 56.1 ¶ 32.) Dr. Nowakowski was not aware of that fact. (*See* Nowakowski 56.1 ¶ 30.) Dr. Helen Durkin, a doctor at SUNY Downstate, made racially charged comments to her, but she did not inform anyone. (RUMC Defs.' 56.1 ¶¶ 40-47.) A bulletin board at SUNY Downstate displays the pictures of previous Ph.D. recipients, residents, and fellows. (*Id.* ¶ 40.) Upon noticing that all of the individuals photographed were white men, Plaintiff asked Dr. Durkin if she had "ever trained any Ph.D. recipients who are minority [sic] or of color." (*Id.* ¶ 44.) Dr. Durkin stated that she had not, because she could not find any. (*Id.* ¶¶ 44-45.) Dr. Durkin went on to explain:

> Well, I can't really find any or I can't find any blacks who are interested because I understand that most blacks really aren't interested in pursuing Ph.Ds. Blacks are not interested in dedicating a lengthy number of years to advancing medical science. I find that most blacks would just prefer to go to med school for four years, get an M.D., make a lot of money quickly, buy a fancy car for themselves, and then go buy a fancy house for their parents. Blacks just don't want to work a long number of years to get a Ph.D. to advance medical science, so that's why I haven't trained any.

(*Id.* ¶ 46.) Plaintiff did not report Dr. Durkin's statement to anyone at SUNY Downstate, including Dr. Nowakowski. (*Id.* ¶ 47.)

Plaintiff also claims that she was excluded from "journal club" meetings at SUNY Downstate where doctors, residents, fellows, and medical students would discuss "the latest medical literature." (*Id.* ¶ 48.) Other fellows received reading materials for these meetings in their mailboxes before the meetings. (*Id.* ¶ 49.) Plaintiff, however, did not have a mailbox. (*Id.*) Plaintiff maintains that Dr. Nowakowski wanted Plaintiff to appear unprepared at the meetings. (*Id.* ¶ 54.) Dr. Nowakowski did not regularly provide her with any materials in advance of the meetings. (*Id.* ¶ 49.) Plaintiff concedes, however, that there were occasions when Dr. Nowakowski would provide Plaintiff with these materials, and that she does not know whether Nowakowski even regularly received the journal club materials. (*Id.* ¶ 54-55.) Plaintiff also was not invited to luncheon lectures by Dr. Nowakowski, even though other supervisors invited their fellows. (*Id.* ¶ 57.) Plaintiff believes this is because she is African American. (*Id.* ¶ 58.) According to Plaintiff, Dr. Nowakowski did not introduce Plaintiff to visitors from other institutions because of her race. (*Id.* ¶¶ 59-60.) Plaintiff never informed Dr. Nowakowski that anyone at SUNY Downstate treated her any differently on account of her race. (Nowakowski 56.1 ¶¶ 31-32.)

## II.     The Second ECRIP Grant

Shortly before the First ECRIP Grant expired, Dr. Nowakowski offered Plaintiff a new two-year grant for which she would receive her pay and benefits through RUMC, instead of CIH (the "Second ECRIP Grant"). (*Id.* ¶¶ 42, 44, 63, 65-66.) RUMC is a healthcare facility and teaching institution that provides acute, medical, and surgical care. (*Id.* ¶ 1.) Plaintiff was informed that the Second ECRIP Grant would last from July 1, 2010, to June 30, 2012. (*Id.* ¶ 68.) Plaintiff was further informed that RUMC had not yet received grant money for her fellowship. (*Id.* ¶ 69.) Plaintiff was provided with three options: (1) reject the offer;

(2) begin work on July 1, 2010, with an understanding that she would be paid when funds were available; or (3) delay her start date until funds were available. (*Id.* ¶ 70.) Plaintiff chose to accept the offer of employment and began work immediately with the understanding that she would not be paid until the grant money was received. (*Id.* ¶¶ 71-73.) Plaintiff was ultimately paid in full for the two-year fellowship, a total sum of $150,000. (*Id.* ¶ 76.) In September 2010, Plaintiff was informed that the Second ECRIP Grant period had "shifted" and would begin on September 16, 2010 and end on September 15, 2012. (*Id.* ¶ 85.) This was despite the fact that Plaintiff had been working from July 1, 2010 for which she was ultimately paid. (*Id.*) Also in September 2010, Plaintiff went to the RUMC campus to meet with Dr. Arsura, the Chief Medical Officer at RUMC during Plaintiff's employment. (*See id.* ¶¶ 4, 77-82.) Upon her arrival at Dr. Arsura's office, Plaintiff introduced herself to Dr. Arsura's administrative assistant, Sharon Clarke. (*See id.* ¶¶ 5, 78.) In response, Clarke initially "stayed silent and her mouth was open." (*Id.* ¶ 79.) She then said "you're Dr. Michelle Watson." (*Id.*) Clarke left her chair, "hastened" into Dr. Arsura's office, and shut the door. (*Id.* ¶ 80.) Approximately seven minutes later, Clarke re-emerged looking "anxious, shaken, [and] like her face was red." (*Id.*) Plaintiff attributes Clarke's reaction to Plaintiff's race. (*Id.* ¶ 81.)

During the Second ECRIP Grant period, Plaintiff alleges that unnamed or unknown individuals treated her poorly because of her race on several occasions. *First*, Plaintiff recalled that petri dishes containing her research were frequently missing. (*Id.* ¶ 99.) Plaintiff has no idea who did this, but believes that it was due to her race. (*Id.* ¶¶ 101-02.) *Second*, Plaintiff recalls another occasion when the door to the shared laboratory was locked. (*Id.* ¶ 105.) Three doctors, including Dr. Nowakowski, asked Plaintiff whether she had locked the door. (*Id.* ¶ 106.) Dr. Durkin stated: "[B]efore certain people showed up here we didn't have this problem,

we didn't have doors being locked, we didn't have petri dishes missing and all of these things going on in this lab." (*Id.* ¶ 107.) Other fellows accused Plaintiff of having locked the door. (*Id.* ¶ 108.) Plaintiff was not disciplined in any way in connection with the locked door. (*Id.* ¶ 110.) *Third*, Plaintiff was not invited to join doctors, fellows, residents, and students for lunch. (*Id.* ¶ 111.) Plaintiff does not know why she was not invited to lunch, but she believes it was on account of her race, or because others had observed her doing menial work at Dr. Nowakowski's request, or some combination of the two. (*Id.* ¶¶ 112-14.) *Fourth*, Plaintiff was not provided with a machine required to do her work (the "NiOx machine"). (*Id.* ¶ 115-18.) Because RUMC could not provide the NiOx machine, Plaintiff was informed by Dr. Nowakowski that her research project would need to change. (*Id.* ¶¶ 134-37.) Plaintiff is not aware of any other fellow whose project changed during their grant period. (*Id.* ¶ 138.) *Fifth*, Plaintiff recalled an occasion when she arrived at Dr. Arsura's office "unannounced" without an appointment. (*Id.* ¶ 124.) Clarke informed Plaintiff that they were not expecting Plaintiff. (*Id.* ¶ 125.) Clarke further informed Plaintiff that Dr. Arsura could not meet with her that day. (*Id.* ¶¶ 127-29.) Plaintiff checked Dr. Arsura's office and, when Plaintiff turned around, noticed Dr. Arsura quickly moving away from her down the hallway. (*Id.* ¶¶ 128-30.) Plaintiff also recalled that Clarke would, on some occasions, call her Michelle, rather than Dr. Watson. (*Id.* ¶ 132.) *Sixth*, Dr. Nowakowski asked Plaintiff to teach students, in particular African American students from Edward R. Murrow high school. (*Id.* ¶¶ 139-40.) Plaintiff was also asked to perform other "menial" tasks such as taking out the garbage, cleaning off Dr. Nowakowski's desk, filing Dr. Nowakowski's mail, rearranging bookshelves, bookcases, journals and books, hauling nitrogen tanks, and cleaning out the refrigerator. (*Id.* ¶ 142.) *Seventh*, Plaintiff did not receive a letter of recommendation from Dr. Durkin, despite asking for one. (*Id.* ¶ 149.) Dr. Durkin told Plaintiff

that she did not have time to write a letter of recommendation and that, because Dr. Nowakowski—and not Dr. Durkin—was Plaintiff's supervisor, Plaintiff should ask Dr. Nowakowski for a recommendation.  (*Id.* ¶¶ 150-11.)

## III.  The Third ECRIP Grant

Dr. Nowakowski applied for and received approval for an additional two-year ECRIP grant (the "Third ECRIP Grant").  (*Id.* ¶ 56.)  This project was slated to run from July 1, 2011, to June 30, 2013.  (*Id.*)  The parties dispute the extent to which Plaintiff was officially hired to serve as a research fellow for this third grant and whether Plaintiff was hired to serve for one or two years. (*See id.* ¶¶ 59-61.)

## IV.  Plaintiff's Termination

On May 18, 2012, Plaintiff was told that her employment would end on June 29, 2012. (RUMC Defs.' 56.1 ¶ 88.)  No one at RUMC told Plaintiff to continue working beyond June 29, 2012.  (*Id.* ¶ 91.)  Dr. Nowakowski, who was not an employee of RUMC, informed Plaintiff that she was trying to keep Plaintiff working beyond June 29, 2012, but never confirmed her ability to do so.  (*Id.* ¶ 92.)  Plaintiff claims that she performed work from June 29 to July 24, 2012, for which she was not paid.  (*Id.* ¶ 93.)  No RUMC employee witnessed Plaintiff perform any work during this period of time.  (*Id.* ¶ 94.)  Plaintiff emailed Clarke on July 23, 2012 to inform Clarke that she had not received a paycheck for the previous pay period.  (*See id.* ¶ 95.)  At some point, Clarke informed Dr. Arsura of Plaintiff's e-mail, and, in response, Dr. Arsura reiterated to Plaintiff that her last day of work had been June 29, 2012.  (*See id.* ¶ 96.)

## V.  Plaintiff's Administrative Complaints

On February 23, 2012, Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon her race.

(*Id.* ¶ 162.)  The EEOC dismissed Plaintiff's charge and issued a right-to-sue letter on May 3, 2013.  (*Id.* ¶ 163.)  On September 20, 2012, Plaintiff filed an administrative charge with the New York State Division of Human Rights ("NYSDHR"), which was cross-filed with the EEOC, alleging race-based discrimination and retaliation.  (*Id.* ¶ 164.)  On March 14, 2013, the NYSDHR issued a "No Probable Cause" determination, finding that RUMC did not engage in the alleged misconduct.  (*Id.* ¶ 165.)  The EEOC dismissed Plaintiff's charge and issued a right-to-sue letter on December 30, 2013.  (*Id.* ¶ 166.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim.  *Celotex Corp.*, 477 U.S. at 325.

Once the movants meet that burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).  The court is to view all facts in the light most favorable to the non-movant, drawing all reasonable inferences in her favor.  *Anderson*, 477 U.S. at 255.  To survive summary judgment, the non-

movant must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) ("The litigant opposing summary judgment . . . 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial.").

## DISCUSSION

### I.     Plaintiff's Title VII Claims Against RUMC

#### A.     Discrimination

Plaintiff alleges disparate treatment on account of her race in violation of Title VII.  (Am. Compl. ¶¶ 102-05.)  It is now long established that Title VII claims are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  "To establish a prima facie case of discrimination, a plaintiff must show: (1) membership in a protected class; (2) qualification for the position [s]he held; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances that give rise to an inference of discrimination."  *Hartley v. Rubio*, 785 F. Supp. 2d 165, 176 (S.D.N.Y. 2011).  There is no dispute that Plaintiff is a member of a protected class and was qualified for the position she held. (RUMC Defs.' 56.1 ¶¶ 14, 218.)  The parties dispute whether Plaintiff suffered an adverse employment action and whether such action occurred under circumstances giving rise to the necessary inference of discrimination.  (RUMC Defs.' Mem. Supp. Mot. Summ. J. ("RUMC Mem.") at 7-10, ECF No. 107-18; Pl.'s Mem. Opp'n RUMC Defs.' Mot. Summ. J. ("Pl.'s RUMC Opp'n") at 6-9, ECF No. 108-50.)

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment."  *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), *abrogated on other grounds as recognized in Davis-Garett v.*

*Urban Outfitters, Inc.*, 921 F.3d 30, 43-44 (2d Cir. 2019) (clarifying legal standard for claims of retaliation). "To be 'materially adverse,' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Crady v. Libert Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Adverse employment actions can include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (quoting *Galabya*, 202 F.3d at 640).

Here, Plaintiff identifies four potential adverse employment actions: (1) Dr. Nowakowski's inducing Plaintiff into agreeing to work on the Second ECRIP Grant while knowing that Plaintiff would be unable to perform the essential functions of that grant; (2) Dr. Nowakowski's assigning Plaintiff menial tasks; (3) Dr. Nowakowski "switch[ing]" Plaintiff from the Second ECRIP Grant to a Third ECRIP Grant; and (4) Dr. Nowakowski's terminating Plaintiff prematurely or failing to hire her for the full term of the Third ECRIP Grant. (Pl.'s RUMC Opp'n. at 6-9.) RUMC Defendants argue that Plaintiff has failed to adduce evidence that this conduct actually occurred, and to the extent it did, that none of this alleged conduct amounts to an adverse employment action.[3] (RUMC Mem. at 7-10.) The Court agrees in part.

---

[3] In addition, RUMC Defendants' argue that Plaintiff failed to administratively exhaust her claim for failure to hire her for the Third ECRIP Grant by failing to include it in her EEOC complaint. (*Id.*) Not so. Exhaustion may be effectuated by filing a complaint with the EEOC or a state equivalent, such as the NYSDHR. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82-83 (2d Cir. 2001) (noting that a plaintiff can exhaust by filing a timely charge with "a state or local agency with authority to grant or seek relief from such practice" (quoting 42 U.S.C. § 2000e-(5)(e)). Although Plaintiff did not raise the Third ECRIP Grant in her EEOC complaint, she did allege in her complaint filed with the NYSDHR that her employment was terminated early. (*Compare* Decl. Ann Shields Supp. Mot. Summ. J. Ex. 13, ECF No. 100-15, *with id.* Ex. 15, ECF No. 100-17.) Thus, Plaintiff exhausted her remedies. RUMC Defendants further argue that Plaintiff's failure to include in her amended complaint a claim for failure to hire her for a Third ECRIP Grant should preclude the Court's consideration of such a claim. (RUMC Mem. at 10.) Because, as discussed in this opinion, any failure to hire did not occur under circumstances giving rise to an inference of discrimination, the Court need not address this argument.

### 1. The Alleged Adverse Employment Actions

#### a. *Fraudulent Inducement*

Plaintiff claims that Dr. Nowakowski knew that a NiOx machine was required for Plaintiff to complete the Second ECRIP Grant project, and yet offered Plaintiff this project with the purpose of forcing Plaintiff to choose between "either not do[ing] any productive work at all or alternatively, [doing] the menial duties that Nowakowski directed." (Pl.'s RUMC Opp'n at 6-7.) The Court cannot conclude that this alleged conduct constitutes an adverse employment action. Put simply, the conduct alleged here is that Dr. Nowakoski offered Plaintiff a job. Offering an individual employment necessarily cannot constitute an adverse employment action. This is particularly the case where Plaintiff was aware that the NiOx machine was not functioning when she accepted the offer of employment. (Nowakowski 56.1 ¶¶ 49, 105.)

#### b. *The Assignment of Menial Tasks*

Plaintiff alleges that, during the course of the Second ECRIP Grant, Dr. Nowakowski "directed Plaintiff to perform administrative and even janitorial duties, including cleaning Nowakowski's desk, emptying garbage, filing mail, and reorganizing bookshelves and bookcases." (Pl.'s RUMC Opp'n. at 7.) Plaintiff also claims that she "was directed to teach high school and Master's students." (*Id.*) Drawing every inference in Plaintiff's favor, the assignment of these tasks could constitute an adverse employment action. While "mere inconvenience[s] or an alteration of job responsibilities" do not constitute adverse employment actions, the Second Circuit has indicated that a diminution in duties can constitute an adverse employment action where the diminution is "so significant as to constitute a setback to the plaintiff's career." *Galabya*, 202 F.3d at 641. Plaintiff testified at deposition that the assignment of menial tasks affected how she was perceived by colleagues and limited her networking opportunities. (Decl. Ann Shields Supp. Mot. Summ. J. Ex. 5, 27:21-30:19, ECF No. 110-7.) A

reasonable juror could conclude that such diminution of duties constituted an adverse employment action.

        *c.*      *Switching Plaintiff from the Second ECRIP Grant to the Third ECRIP Grant*

Plaintiff claims that Dr. Nowakowski's "switching" of Plaintiff from the Second ECRIP Grant to the Third ECRIP Grant prior to the Second ECRIP Grant's expiration constituted an adverse employment action. It is undisputed that Dr. Nowakowski adjusted the focus of Plaintiff's research from "Immunological and inflammatory response to HAART (Highly Active Anti-Retroviral Treatment) in subjects with HIV-1 disease and allergic asthma" to "Mechanism of Sophorolipid Suppression of Septic/Endotoxic Shock." (Nowakowski Reply 56.1 ¶¶ 97, 109, 114-17.) Plaintiff cites no evidence, however, from which a jury could conclude that this "switch" caused a materially adverse change in the terms and conditions of Plaintiff's employment. *See Galabya*, 202 F.3d at 640. Plaintiff has not explained how this switch "was to an assignment that was materially less prestigious, materially less suited to [her] skills and expertise, or materially less conducive to career advancement." *Id.* Moreover, Plaintiff does not claim that she received a reduced salary or benefits pursuant to the switch. This shift in research focus, therefore, amounts to nothing more than an "alteration of job responsibilities" that is not actionable. *Id.* (quoting *Crady*, 993 F.2d at 136).

        *d.*      *Terminating or Failing to Hire Plaintiff for the Third ECRIP Grant*

Plaintiff claims that RUMC Defendants, in concert with Dr. Nowakowski, prematurely terminated Plaintiff on July 24, 2012, or, in the alternative, failed to hire Plaintiff for the second year of the Third ECRIP Grant. (Pl.'s RUMC Opp'n at 9.) The parties dispute whether Plaintiff was hired as the fellow for the entire term of the Third ECRIP Grant or whether she was only hired to serve as a fellow for the first year of the Third ECRIP Grant. (Nowakowski 56.1 ¶¶ 109,

113.)  Premature termination or failure to hire may constitute adverse employment actions.  *See*

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (identifying "acts such as

termination . . . or refusal to hire" as examples of adverse employment actions).  Therefore, the

parties' dispute on this issue constitutes a triable issue of fact.

### 2.    Inference of Discrimination

A plaintiff may establish the necessary inference of racial discrimination by proffering

either direct or indirect evidence of discriminatory intent.  *Haskell v. Kaman Corp*., 743 F.2d

113, 119 (2d Cir. 1984).  Direct evidence of discrimination would exist in the form of

disparaging comments regarding a plaintiff's protected class.  *Id.*  Indirect evidence of racial

discrimination could include evidence that similarly situated comparators outside of Plaintiff's

protected class were treated more favorably than the plaintiff.  *See Deuel*, 2015 WL 4394085, at

*5 (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)).  To succeed

on such a claim, however, the proffered comparator must indeed be similarly situated.  An

employee is considered similarly situated to co-employees if they were (1) "subject to the same

performance evaluation and discipline standards" and (2) "engaged in comparable conduct."

*Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir. 2000). "[T]he standard for comparing

conduct requires a reasonably close resemblance of the facts and circumstances of [the]

plaintiff's and comparator's cases, rather than a showing that both cases are identical."  *Id.*

As discussed above, here, Plaintiff has adduced sufficient evidence to support two

potential adverse employment actions:  (1) the assignment of menial tasks during the course of

the Second ECRIP Grant and (2) the premature termination of Plaintiff's employment or failure

to hire Plaintiff in July 2012.  As Defendants correctly argue, however, Plaintiff has failed to

adduce evidence that this conduct occurred under circumstances giving rise to an inference of

discrimination.

*First*, the little direct evidence of race discrimination, such as the statements Plaintiff attributes to Dr. Durkin and others, cannot support Plaintiff's claim because none of these individuals were decisionmakers with respect to any adverse employment action. *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004) (evidence that plaintiff's colleague made racially derogatory remarks were insufficient to raise an inference of discrimination, where there was no evidence that the colleague played a role in the decision to terminate plaintiff, and where there was no evidence of bias on the part of those who did decide to terminate plaintiff). While Dr. Durkin's comments, if true, are abhorrent, it is undisputed that Dr. Durkin was not Plaintiff's supervisor (RUMC 56.1 ¶ 13), and Plaintiff has adduced no evidence that Dr. Durkin had any role in any employment decision related to Plaintiff. Moreover, Plaintiff concedes that Dr. Nowakowski, the individual who made decisions related to Plaintiff's employment, was unaware of Dr. Durkin's statements. (*Id.* ¶ 47.) Plaintiff adduces no evidence to suggest that Dr. Nowakowski was aware of the comments made by the "young African American female" administrative assistant who, according to Plaintiff, greeted her by saying: "None of us have ever worked back there doing what you are going to be doing. Usually we're here typing or we're out sweeping as a part of the staff, but we're not back there doing what you're doing. So welcome." (*See* RUMC 56.1 ¶¶ 32, 37.) Nor has Plaintiff adduced any evidence to suggest that this unnamed individual played any role with respect to any adverse employment action.[4]

---

[4] Plaintiff argues that SUNY Downstate employees, such as Dr. Durkin, could be considered agents of RUMC Defendants for purposes of the Second and Third ECRIP Grants. (Pl.'s RUMC Opp'n at 4.) However, these statements occurred during the course of the First ECRIP Grant. Therefore, even under an agency theory, Dr. Durkin's and the unidentified administrative assistant's statements cannot be attributed to RUMC. *Farganis v. Town of Montgomery*, 397 F. App'x 666, 668 (2d Cir. 2010) ("A party seeking to introduce a vicarious admission under this rule must establish (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.") (quotations omitted).

*Second*, the conduct that Plaintiff has adduced related to her supervisors, Dr.

Nowakowski and Dr. Arsura, does not support an inference of discrimination. Plaintiff claims

that in July, or August of 2010, Dr. Nowakowski stated to Plaintiff: "[I]f you're so concerned

about not having health coverage, why don't you go across the street to the county hospital and

get yourself some Medicare-Medicaid." (RUMC Defs.' 56.1 ¶ 28.) Plaintiff maintains that,

"while the mere suggestion to someone to apply for Medicaid is not, in and of itself, a racially

tinged statement, Kings County Medical Center is widely known to serve poor people of color

who in many cases utilize its facilities with the assistance of Medicaid."[5] ([RUMC Defs.']

Counter-Statement Pl.'s "Statement Additional Material Facts Which Contended Exists Genuine

Issue Be Tried Pursuant Local Civ. R. 56.1(b)" ¶ 226, ECF No. 107-20.) This does not suffice as

direct evidence, particularly because Plaintiff does not tie this statement in any way to any

adverse employment decision made by Dr. Nowakowski. *See Tyler v. Bethlehem Steel Corp.*,

958 F.2d 1176, 1185 (2d Cir. 1992) ("Strictly speaking, the only 'direct evidence' that a decision

was made 'because of' an impermissible factor would be an admission by the decisionmaker

such as 'I fired him because he was too old.'"). Moreover, Plaintiff's supposition regarding the

motivations for this statement does not suffice to create a triable issue of fact. "[A] jury cannot

infer discrimination from thin air. Plaintiff[ ] ha[s] done little more than cite to [her]

mistreatment and ask the court to conclude that it must have been related to [her] race." *Lizardo*

---

[5] Plaintiff suggests that Magistrate Judge Bloom's June 24, 2016 report & recommendation found that this statement alone could suggest the necessary discriminatory inference. (Pl.'s RUMC Opp'n at 12-13.) Not so. Magistrate Judge Bloom found that this alleged statement, accepted as true and taken together with all of Plaintiff's factual allegations, sufficed to create an inference of discriminatory intent at the motion-to-dismiss stage. (R. & R. at 23, ECF No. 64.) Although Plaintiff's allegations, accepted as true at the time, were sufficient to survive Defendants' motions to dismiss, bare allegations, without more, are insufficient at the summary-judgment stage. "When the [summary judgment] motion is made, we go beyond the paper allegations of the pleadings, which were enough to survive the common law demurrer. The time has come . . . 'to put up or shut up.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

*v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) (citation omitted).[6]

With respect to Dr. Arsura, Plaintiff has adduced even less evidence. Specifically, Plaintiff recalls an occasion on which Dr. Arsura was rude to her, and complains that Dr. Arsura did not respond to Plaintiff's request for new equipment. (RUMC Defs.' 56.1 ¶¶ 116-17, 124-30.) Absent again, however, is evidence that this conduct was in any way related to any adverse employment action.

In lieu of direct evidence of discrimination, Plaintiff argues that the necessary discriminatory inference can be established by the comparatively more favorable treatment of other ECRIP fellows, and by the fact that Plaintiff was "the first and only African-American ever to have worked either under Dr. Nowakowski or for RUMC as an ECRIP fellow." (Pl.'s RUMC Opp'n at 10-11.) While a plaintiff can demonstrate disparate treatment with proof that an employer treated a plaintiff less favorably than "similarly situated" employees outside of her protected group, to succeed on such a claim, a plaintiff must, in fact, identify such comparators. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997).

Plaintiff does not specifically identify a single purported comparator. Instead, she vaguely refers to two groups of potential comparators: (1) "other ECRIP fellows working in the SUNY Pathology laboratory at the same time" and (2) Dr. Nowakowski's prior ECRIP fellows. (Pl.'s RUMC Opp'n at 12.) But such generalized allegations do not permit the Court to determine whether these comparators are, in fact, similarly situated to Plaintiff, particularly with respect to the adverse employment actions at issue. *See Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 417–18 (2d Cir. 2011) (summary order) (affirming summary judgment where

---

[6] Plaintiff also recalls an occasion when Dr. Nowakowski's hand brushed the hand of an African American "custodial gentleman" and, in response, Dr. Nowakowski "screamed and jumped away." (RUMC 56.1 ¶ 228.) While Plaintiff reads into this incident an inference of racial discrimination, the Court cannot find that this isolated incident, disassociated in time from any adverse employment action, gives rise to such an inference.

the plaintiff offered "little more than conclusory statements" and "sweeping allegations unsupported by admissible evidence" regarding alleged comparators); *Shumway*, 118 F.3d 60, 65 (2d Cir. 1997) (same).

With respect to the other ECRIP fellows working in the SUNY Pathology laboratory at the same time as Plaintiff, Plaintiff does not identify these individuals' supervisors, the projects they worked on, their relative experience, or their qualifications. (*See* RUMC Defs.' 56.1 ¶¶ 31, 49, 57, 143; RUMC Defs. Reply 56.1 ¶¶ 231, 236-37, 242-43, 249.) Indeed, rather than presenting affidavits from individuals with personal knowledge, such as the other ECRIP fellows and their supervisors, Plaintiff summarily states that, based on her own personal observations, other fellows were not required to engage in menial tasks. (RUMC 56.1 Reply ¶ 249.) This conjecture is insufficient to create a triable issue of fact, as Plaintiff lacks the requisite personal knowledge necessary to attest to the scope of other fellows' employment, especially given her previous testimony regarding her limited interaction with other fellows. (*See* Decl. Geoffrey Schotter, Esq., Opp'n [RUMC Defs.'] Mot. Summ. J. & Opp'n Def. Maja Nowakowski's Mot. Summ. J. ("Schotter Decl.") Ex. A at 48:7-49:10, 49:23-51:17; 54:2-55:16, ECF No. 102-3). Moreover, Plaintiff has failed to adduce any evidence that other ECRIP fellows were not subject to termination after one year of a two-year fellowship or, alternatively, were hired for the Third ECRIP Grant in her stead.

With respect to Dr. Nowakowski's former ECRIP fellows, Plaintiff has adduced similarly scant evidence. While Plaintiff established that Dr. Nowakowski's previous fellows were not African American, Plaintiff does not identify the projects these individuals worked on, their relative experience, or their qualifications. And, fatal to Plaintiff's claims, Plaintiff has failed to adduce evidence that these individuals were treated differently than Plaintiff.

Specifically, Plaintiff has failed to adduce any evidence that Dr. Nowakowski's prior ECRIP fellows were not assigned purportedly menial tasks. Moreover, Plaintiff has failed to adduce any evidence that Dr. Nowakowski never terminated a previous ECRIP fellow one year into a two-year fellowship, or, regularly hired current ECRIP fellows for future ECRIP grants. In the absence of such evidence, Plaintiff has failed to create a genuine issue of material fact worthy of trial.

## B. Hostile Work Environment

To establish a hostile-work-environment claim under Title VII, a plaintiff must adduce sufficient evidence to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (citations omitted). In addition, a plaintiff must show that the environment was both subjectively and objectively hostile and abusive. *Id*. In assessing a hostile-work-environment claim, a district court looks to the record as a whole and considers the totality of the circumstances, evaluating a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. Defendants maintain that Plaintiff fails to make the requisite showing and thus her hostile work environment claim should be dismissed accordingly. (RUMC Mem. at 11-15.) The Court agrees, in part.

As a threshold matter, Plaintiff's hostile-work-environment claim is overbroad. Plaintiff seeks to extend liability to RUMC for conduct that occurred before her employment by RUMC and include her time spent in the employ of SUNY Downstate. (Pl.'s RUMC Opp'n at 2-3.)

Specifically, Plaintiff claims that two statements made during the First ECRIP Grant should be attributed to RUMC, one by Dr. Durkin, and the other by an unidentified administrative assistant. (*Id.* at 11, 13.) Because neither Dr. Durkin nor the administrative assistant were employed by RUMC at the time the statements were made, their statements are cannot form the basis of a hostile-work-environment claim against RUMC.[7] *See* supra Note 4. Accordingly, the Court has limited its consideration to only those incidents alleged to have occurred after July 1, 2010 – the date on which Plaintiff became employed by RUMC.

Plaintiff has adduced evidence that petri dishes containing her research were left out of the incubator or with their covers removed; the door to the laboratory was locked and she was asked by doctors and other fellows whether she had locked it; she was not invited by her supervisors and peers to join them for lunches; Dr. Durkin stated, in Plaintiff's presence, that "Before certain people showed up here we didn't have this problem, we didn't have doors being locked, we didn't have petri dishes missing and all of these things going on in this lab;" Plaintiff was not provided with a NiOx machine necessary to complete her research project; Plaintiff's research project was changed; Dr. Arsura was rude to Plaintiff; Plaintiff was not provided with all of the letters of recommendation that she requested; and Dr. Nowakowski stated to Plaintiff: "If you're so concerned about not having health coverage, why don't you go across the street to the county hospital and get yourself some Medicare-Medicaid." (RUMC Defs.' 56.1 ¶¶ 28; 99; 105-08; 111; 124-31; 134-36; 139-42; 143-51.) This is just not the sort of severe or pervasive conduct proscribed by Title VII. *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) (finding that "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless

---

[7] Even if the Court were to hold RUMC liable for misconduct that allegedly occurred during the First ECRIP Grant, such as Dr. Nowakowski's refusal to provide Plaintiff with some but not all letters of recommendation, or failure to provide Plaintiff with the necessary materials for "journal club," these incidents fall short of the level of severity or pervasiveness necessary to defeat Defendant's motion for summary judgment.

extremely serious) will not support a claim of discriminatory harassment."). That is, although Plaintiff has presented evidence of conduct that may have been rude and even insulting, these incidents are properly viewed as trivial workplace grievances not actionable under law. *See Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (affirming summary judgment where the remarks, including one about "black food," did not qualify as "a steady barrage of opprobrious racial comments that altered the conditions of [plaintiff's] employment" (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997))).

Even if some of Plaintiff's allegations could be construed as sufficiently severe or pervasive—such as the change in Plaintiff's research project – there is no evidence that they were motivated by race. "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano c. Costello*, 294 F.3d 365, 377 (2d Cir. 2002); *see also Chukwuka v. City of New York*, 513 F. App'x 34, 36-37 (2d Cir. 2013) (summary order) ("[I]t is axiomatic that mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's [protected characteristic]" (quoting Brown v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)). Plaintiff failed to proffer evidence of such a link.[8]

---

[8] Moreover, at least with respect to certain conduct, the record allows only for the conclusion that the complained-of conduct was wholly unrelated to race. There is no evidence to contradict Defendants' assertion that they did not have a NiOx machine to offer Plaintiff, and as such her project had to change. Additionally, there is no evidence demonstrating that Dr. Arsura's alleged rudeness was predicated on anything other than the fact that on one occasion Dr. Arsura refused to meet with Plaintiff when Plaintiff arrived to Dr. Arsura's office without a pre-scheduled appointment. And, Plaintiff does not dispute that on another occasion, "Plaintiff showed up at RUMC unannounced" and "met with Arsura for no more than 15 minutes." (RUMC Defs.' 56.1 ¶¶ 118, 121.) Likewise, there is no evidence from which to infer that Dr. Durkin's statement was directed at Plaintiff at all, let alone made because of her race.

That said, construing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that two categories of conduct were both objectively and subjectively hostile, and occurred because Plaintiff is African American. It is undisputed that: (1) Dr. Arsura's administrative assistant would sometimes call Plaintiff Michelle instead of Dr. Watson (RUMC Defs.' 56.1 ¶ 132); and (2) Plaintiff was directed to perform menial tasks, such as taking out the garbage, and teaching African American students. (*Id.* ¶¶ 139-42). With respect to these facts, the Court finds Plaintiff's claims not unlike those in *Patterson v. County of Oneida*, 375 F.3d 206 (2d Cir. 2004). In *Patterson*, the court found a triable issue on a § 1981 hostile-work-environment claim where the plaintiff, an African American corrections officer, claimed that a white lieutenant "subjected [the plaintiff] to constant humiliation by refusing to speak to him and by always saluting White officers in [the plaintiff's] presence and never returning a salute from [plaintiff]." *Id.* at 229; *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (holding that the same standard applies to hostile-work-environment claims under both Title VII and § 1981). Being made to perform janitorial services and denied recognition for an earned medical degree could be deemed as constantly humiliating as not being returned a salute. Whether such conduct amounts to a hostile work environment is a triable issue of fact.

### C. Retaliation

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must generally show that: (1) [s]he engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) h[er] employer was aware of that activity; (3) [s]he suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Giscombe v. New York City Dep't of Educ.*, 39 F. Supp. 3d 396,

401 (S.D.N.Y. 2014) (quoting *Cretella v. Liriano,* 633 F.Supp.2d 54, 74 (S.D.N.Y. 2009), *aff'd,* 370 Fed. App'x. 157 (2d Cir. 2010)).

The parties do not dispute that Plaintiff's filing of the February 2012 EEOC charge against RUMC was a protected activity and that Plaintiff's termination or RUMC's failure to re-hire Plaintiff constituted a materially adverse employment action. (Pl.'s RUMC Opp'n at 18-19; RUMC Mem. at 17-18.) The parties dispute, however, whether Plaintiff's termination was causally related to the filing of Plaintiff's EEOC charge. (Pl.'s RUMC Opp'n at 19-20; RUMC Mem. at 17-18.)

Plaintiff filed an EEOC charge on February 23, 2012. (*Id.* ¶ 162.) Plaintiff was terminated sometime between June 29, and July 24, 2012. (RUMC 56.1 ¶¶ ¶ 92-96.) While Plaintiff has provided the Court with a copy of her February 2012 EEOC complaint, she has failed to point to any evidence that any individuals at RUMC, including Dr. Nowakowski, were aware of Plaintiff's EEOC complaint until at least August 2012. (*See* RUMC 56.1 ¶ 54.) If RUMC Defendants were unaware of Plaintiff's complaint until August 2012, they could not have terminated Plaintiff in retaliation for that complaint in June or July 2012. *See Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528 MKB, 2014 WL 4773975, at *23-24 (E.D.N.Y. Sept. 24, 2014) (granting summary judgment and dismissing a plaintiff's claim where "[p]laintiff cannot show a causal connection between this complaint and her termination, since there is no evidence that the decision-makers who investigated and ultimately terminated [p]laintiff had actual knowledge of her complaint").

Moreover, even assuming that RUMC Defendants were aware of Plaintiff's EEOC complaint in February 2012, Plaintiff's only proffered basis for establishing the requisite causal connection is the proximity between the February 2012 complaint and her June or July 2012

22

termination.  But "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (finding that three months or more is insufficient to establish the requisite causal connection).  And the Second Circuit has found that a time period of four months between the protected activity and adverse employment action is too attenuated to establish the requisite causal connection.  *See Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011).  Here, where Plaintiff's sole evidence in support of the necessary causal connection is the four-or five-month span between Plaintiff's EEOC complaint and alleged termination, Plaintiff cannot establish a *prima facie* retaliation claim.[9]

## II.  Equal Protection Claim

Plaintiff alleges that Dr. Nowakowski violated her rights under the Equal Protection Clause of the Fourteenth Amendment.  (Am. Compl. ¶¶ 117-120.)  "The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from 'invidious discrimination in

---

[9] Plaintiff initially alleged retaliation on the basis of a 2012 wage garnishment.  (*See* RUMC 56.1 ¶¶ 152-54.)  While the RUMC Defendants moved for summary judgment with respect to that retaliatory wage garnishment claim, Plaintiff failed to address that argument in her opposition.  On this ground alone, the Court could grant RUMC Defendants summary judgment with respect to any retaliatory wage garnishment claim.  "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).  In any event, this claim is meritless because Plaintiff has failed to adduce evidence that her wage garnishment had any relation to her EEOC charge.  To the contrary, the garnishment of Plaintiff's wages was pursuant to an income execution served by New York City Marshals on RUMC based on Plaintiff's failure to pay a debt owed to Citibank pursuant to New York C.P.L.R. § 5231.  (*See* RUMC 56.1 ¶¶ 152-54.)  N.Y. C.P.L.R. § 5231 does not appear to provide an employer with discretion over whether to withhold wages:  "A person served with an income execution *shall* withhold from money then or thereafter due to the judgment debtor installments as provided therein and pay them over to the sheriff.  If such person shall fail to so pay the sheriff, the judgment creditor may commence a proceeding against him for accrued installments."  *Id.* (emphasis added).  Therefore, Plaintiff has failed to establish the necessary causal connection.

statutory classifications and other governmental activity.'" *Grennan v. Nassau Cty.*, No. CIVA042158, 2007 WL 952067, at \*13 (E.D.N.Y. Mar. 29, 2007). "The Equal Protection Clause [thus] requires that the government treat all similarly situated people alike." *Id.* (quoting *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)). To make out a violation of the Equal Protection Clause, Plaintiff was required to produce evidence demonstrating "(1) that [s]he was treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Rodriguez v. Clinton*, 357 F. App'x 355, 357 (2d Cir. 2009) (alterations original).

Plaintiff's allegations against Dr. Nowakowski are largely identical to Plaintiff's claims against the RUMC Defendants. Indeed, Plaintiff appears to have simply copied-and-pasted the majority of her briefing with respect to the RUMC Defendants into her opposition to Dr. Nowakowski's motion. Because the substantive standards of an equal-protection claim are functionally the same as the standards with respect to a Title VII claim, the Court's conclusions with respect to the RUMC Defendants apply equally to Dr. Nowakowski. *See Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) ("The elements of [a Title VII claim] are generally the same as the elements of [an equal protection claim] and the two must stand or fall together.").[10]

---

[10] The primary difference between the claims against the RUMC Defendants and those against Dr. Nowakowski is that under § 1983, Plaintiff must establish Dr. Nowakowski's "direct participation in the alleged violation[s]," "gross negligence in the supervision of subordinates who committed the wrongful acts," or "failure to take action upon receiving information that constitutional violations are occurring." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004). As described in greater detail above, none of Dr. Nowakowski's direct conduct establishes the requisite discrimination, hostile work environment, or retaliation. Moreover, Plaintiff has failed to adduce evidence that Dr. Nowakowski directed or was aware of discriminatory acts carried out by others whom she supervised. Therefore, because Plaintiff could not establish her Title VII claims, she cannot establish individual liability against Dr. Nowakowski.

**III. FLSA Claims**

Plaintiff alleges that RUMC's failure to pay Plaintiff's wages from June 30, 2012 and July 24, 2012 violated the FLSA's minimum wage requirements.  An employee who sues for unpaid minimum wages or overtime compensation has the burden of proving that the employer did not compensate him for completed work.  *Grochowski v. Phoenix Const.*, 318 F.3d 80, 87–88 (2d Cir. 2003) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686–87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)).  "[A]n employee has carried out [her] burden if [s]he proves that [s]he . . . performed work for which [s]he was improperly compensated and if [s]he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id*.; *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (To establish liability under the FLSA on a claim for unpaid [wages], a plaintiff must prove that [s]he performed work for which [s]he was not properly compensated, and that the employer had actual or constructive knowledge of that work."); *see also Chao v. Gotham Registry, Inc*., 514 F.3d 280, 287 (2d Cir. 2008) ("It is clear an employer's actual or imputed knowledge that an employee is working is a necessary condition to finding the employer suffers or permits that work.").

Here, Plaintiff was informed on May 18, 2012, that her employment would end on June 29, 2012.  (RUMC 56.1 ¶ 88.)  Plaintiff claims that she continued working from June 29, 2012 to July 24, 2012, but no RUMC employee witnessed Plaintiff perform any work during this period of time.  (*Id.* ¶¶ 93-94.)  The only evidence Plaintiff provides to prove that she continued to work is a July 23, 2012 email to Clarke, informing Clarke that Plaintiff had not received a paycheck for the previous pay period.  (*Id.* ¶ 95.)  In response, Dr. Arsura, to whom Clarke apparently forwarded the email, informed Plaintiff:  "As you know, your employment with Richmond University Medical Center ended on June 30, 2012, the date the grant expired.  Since you did not work for Richmond University Medical Center from July 1 through July 14, no paycheck for the

most recent pay period will be provided." (Schotter Decl., Ex. M, ECF No. 102-15.) This email does not indicate that Defendants had actual or constructive knowledge that Plaintiff was working up until July 23, 2012. To the contrary, in the email, Dr. Arsura informs Plaintiff that RUMC did not believe that Plaintiff was continuing to work for RUMC and, in no uncertain terms, informed Plaintiff that RUMC would not continue to compensate her.

## IV. State-Law Claims

Defendants contend that they are entitled to summary judgment on Plaintiff's breach of contract claims because Plaintiff has failed to adduce any evidence demonstrating a breach. The Court agrees.

To be successful on a claim for breach of contract under New York law, a plaintiff must demonstrate: (1) the existence of a contract; (2) that the plaintiff has performed her obligations under the contract; (3) that the defendant failed to perform its obligations thereunder; and (4) that plaintiff was thereby damaged. *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*., 156 F. App'x 349, 350–51 (2d Cir. 2005) (summary order); *Brooklyn 13th Street Holding Corp. v. Nextel of N.Y.*, Inc., No. 11-cv-1048, 2011 WL 6945862, at *3 (E.D.N.Y. Dec. 30, 2011).

Plaintiff maintains that Defendants are liable for their breach of two contracts: the First ECRIP Grant Agreement, and the RUMC Agreement. (Pl.'s Opp. 32-35.) With respect to the First ECRIP Agreement, Plaintiff alleges that RUMC Defendants breached the First ECRIP Grant by failing to allocate certain funds for Plaintiff's use in pursuing her project. (Am. Compl. ¶ 136.) To satisfy her burden of proving the existence of a contract, Plaintiff directs the Court to a series of documents referred to as "Start-up Reports." (Pl.'s Opp. 24.) These documents relate to the Second and Third ECRIP Grants – not the allegedly breached First ECRIP Grant Agreement. (Decl. of Michelle Watson Ex. K, L (ECF. 117-11, 117-12.)). For this reason alone

Plaintiff's breach of contract claim fails. Assuming the Start-up Reports related to the First ECRIP Agreement, Plaintiff has failed to adduce evidence that they constitute a valid and enforceable employment agreement. Yes, the Start-up reports identify the commencement dates of the agreements, and the parties – Plaintiff, as a research candidate; Dr. Nowakowski, as a sponsor/mentor; and Dr. Arsura, as the principal contact. However, absent from the Start-up Reports are the indicia of an employment agreement necessary under law. Under New York law, an employment contract must include, among other things the terms of employment including the duration of the contract, and the salary. *Morizio v. Roeder*, 58 Misc. 3d 1210(A), 94 N.Y.S.3d 539 (N.Y. Sup. Ct. 2018). None of these terms are included in the Start-up Reports. The deficiencies do not stop there. Even if the Court could somehow construe the Start-up Reports as a contract related to the First ECRIP Grant, Plaintiff has failed to adduce evidence of a breach. According to Plaintiff, Defendants acted in breach of the purported First ECRIP Grant Agreement because they failed to allocate additional funds for Plaintiff in pursuing her project. Nowhere in the Start-up Reports is there any mention of funding, let alone an obligation by Defendant's to provide additional funding.

The alleged breach of the RUMC Agreement is similarly deficient. As to this agreement, Plaintiff explains that Defendants failed to pay her for her accrued holidays or vacation, sick, or personal days as she alleges. (Decl. of Michelle Watson Ex. UU at. 13 (ECF. 117-47)). This document, however, indicates nothing more than that Plaintiff was entitled to certain paid time off. The document does not indicate how much time Plaintiff had accrued and was subject to payment upon conclusion of her employment. Plaintiff provides no paystubs or other evidence that might show any payment deficiency. Plaintiff does not even include a sworn affidavit attesting to owed monies. Accordingly, Plaintiff's breach-of-contract claims must be dismissed.

**CONCLUSION**

For the foregoing reasons, Defendant Nowakowski's motion for summary judgment is GRANTED, and RUMC Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Defendant Nowakowski's motion for summary judgment is GRANTED with respect to Plaintiff's equal protection and breach of contract claims, both of which are dismissed with prejudice.  RUMC Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claims for disparate treatment, retaliation, violations of the Fair Labor Standards Act, and breach of contract, all of which are dismissed with prejudice.  RUMC Defendants' motion is DENIED with respect to Plaintiff's hostile work environment claim.  The only claim remaining for trial is Plaintiff's hostile work environment claim.

SO ORDERED:

_____/s/LDH_____
LASHANN DEARCY HALL
United States District Judge

Dated: Brooklyn, New York
       October 10, 2019